IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

KENNADIE GRACE WILCOX,       )
                                  )
         Plaintiff,            )
                                  )
    v.                           )
                                  )  CASE NO. 2:19-cv-650-RAH
ANDALUSIA CITY SCHOOLS      )          [WO]
BOARD OF EDUCATION, *et al.*,    )
                                  )
        Defendants.      )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Kennadie Grace Wilcox brings this action against Defendants Andalusia City Schools Board of Education (the Board), Dr. Daniel Shakespeare in his individual capacity, and Ted Watson in his individual capacity. She brings claims under 20 U.S.C. § 1681 *et seq.* (Title IX), 42 U.S.C. § 1983, and Alabama state law. Her claims relate to an alleged sexual relationship between her and her high school teacher, Anthony Clark, and alleged sexual harassment perpetrated by Dr. Shakespeare. Now pending before the Court are the Defendants' Motion for Partial Summary Judgment (Doc. 62), Motion to Strike Portions of Declaration of Plaintiff (Doc. 73), and Motion to Strike Portions of Declaration of Kimberly Wilcox (Doc. 74). The motions are fully briefed and ripe for review.

## II.  JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over Wilcox's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over her state law claims under 28 U.S.C. § 1367(a).  Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III.  LEGAL STANDARD

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  FED. R. CIV. P. 56(c)(1)(B); *see also* FED. R.

Civ. P. 56 advisory committee's note to 2010 amendment ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  BACKGROUND

The facts, stated in the light most favorable to Wilcox, are as follows:

Wilcox is a former high school student of Andalusia High School (AHS) in Andalusia, Alabama. At all relevant times, Dr. Shakespeare was the principal at AHS, and Watson was the superintendent of the Andalusia City Schools system. When Wilcox was an 18-year-old senior at AHS, she allegedly had a months-long sexual relationship with Anthony Clark, an AHS teacher and coach. The parties agree this relationship was illegal under Alabama law, even if consensual,[1] and also violated AHS policy. At the same time, Wilcox also was allegedly subjected to

---

[1] *See* Ala. Code §§ 13A-6-81 to 13A-6-82.

3

verbal sexual harassment and unwanted touching by Dr. Shakespeare.  Unable to cope emotionally, she attempted suicide approximately one month before graduation.  Except for a brief period of time one morning, Wilcox did not return to AHS after her suicide attempt, although she did graduate and receive her diploma. This lawsuit relates to her allegations of a sexual relationship with Clark, Dr. Shakespeare's sexual harassment of her, and the Defendants' failure to prevent these incidents and respond to them.

In April 2016, Clark applied for an open basketball coach position at AHS. Clark's resume indicated he was currently working at Boaz High School and had previously worked at Douglas High School, UMS-Wright Preparatory School (UMS-Wright), Pleasant Home School, and Beauregard High School.  Clark was interviewed by a team comprising Watson, Dr. Shakespeare, and others, although the record does not reveal the identities of the others.[2]   Watson conducted background checks on applicants prior to interviewing them.  Watson ultimately recommended that the Board hire Clark for the position, and on April 27, 2016, the Board voted to hire Clark effective August 2, 2016.[3]   Prior to making his

---

[2] Dr. Shakespeare claims Watson was part of the interview team, although Watson claims he was not.

[3] Board policy vests with the Board the duty and authority to "appoint . . . Andalusia City School System employees upon the written recommendation of the Superintendent."  ANDALUSIA CITY BOARD OF EDUCATION POLICY, at 13, Chapter 2.20(II)(E) (July 28, 2014), https://drive.google.com/file/d/1UioDig0IHbsnQE0pWHtvUsjtWt2Sjnj5/view.

recommendation, Watson did not contact Clark's current or former employers, nor did he contact any board members of the school systems where Clark previously had worked.

The day after the Board voted to hire Clark, Watson received an anonymous email alleging that Clark had solicited and received oral sex from a ninth-grade student during the 2000–2001 school year when Clark was a coach at Pleasant Home School.  Around the same time, AHS's Title IX investigator, Sonja Hines, received an anonymous Facebook message alleging that Clark had engaged in a sexual relationship with and had impregnated a student teacher at UMS-Wright.[4]  Hines then relayed this information to Watson.

Watson traveled to Boaz to question Clark about the allegations in the email and Facebook message.  Clark denied the allegations that he had sexual contact with a ninth grader at Pleasant Home, but he admitted he had a sexual relationship with an adult graduate student assistant at UMS-Wright and had a baby with her.  Watson later saw Pleasant Home's principal at a baseball game and asked the principal if Clark had a clean record, and the principal said he did.  However, Watson did not ask the principal specifically about whether Clark had any sexual harassment complaints or show the principal the anonymous email.  After speaking with Clark,

---

[4] Although the record does not reveal the date on which the Facebook message was received, it is undisputed that it was received after the Board voted to hire Clark.

Watson did not contact anyone at UMS-Wright because, according to Watson, Clark's actions "while not stellar[] morally were not illegal." (Doc. 63-3 at 128.) Watson also did not follow up to confirm the graduate student assistant's age.

In approximately May 2016, Watson told one of the Board members, Dr. McCalman, about the allegations against Clark in the email and Facebook message, but Watson did not tell the entire Board. According to Watson, Dr. McCalman was concerned about the allegations. Nonetheless, Clark began his employment as a coach and teacher at AHS in August 2016.

According to Wilcox, she began having a sexual relationship with Clark in January 2018, the second semester of her senior year, which continued through April 2018. Wilcox and Clark allegedly had sex on school grounds both during and after school hours, and they also had sex at Clark's house on at least one occasion.

Board policy defines sexual harassment as "unwelcome sexual advances, requests for sexual favors and other inappropriate verbal, non-verbal or physical conduct of a sexual nature." (Doc. 68-6 at 13.) Board policy also requires all employees "to promptly report any occurrence of alleged sexual harassment" by reporting complaints to the Superintendent or designee in writing and signed by the complainant, stating the act(s), the date(s), and the name(s) of witnesses. (*Id.* at 14.) Additionally, Alabama's mandatory reporting statute requires all school teachers and officials to report any suspected child abuse. *See* ALA. CODE § 26-14-3.

In addition to telling several friends about her relationship with Clark, Wilcox says she also told a teacher, Cavelle Jones, and a coach, Harrison Mims, about the relationship, but neither Jones nor Mims reported it.

According to Wilcox, Dr. Shakespeare also knew about her sexual relationship with Clark while it was ongoing, but he did not report it or otherwise respond to it. She claims Dr. Shakespeare told her he knew about her relationship with Clark, although she says she denied the existence of the relationship to him.[5] Dr. Shakespeare also allegedly told her she should not be with a white man when she could be with Dr. Shakespeare. Clark is white, and Dr. Shakespeare is African-American. Moreover, Wilcox asserts in a declaration that Dr. Shakespeare acknowledged "several times" the sexual relationship between her and Clark, and also that Dr. Shakespeare told her that several staff members had told him about her

---

[5] The Defendants argue that because Wilcox denied the relationship to Dr. Shakespeare, she cannot show that he knew about it. But her denial of the relationship does not, as a matter of law, negate Dr. Shakespeare's claimed knowledge of it. At best, it creates a genuine dispute of material fact as to Dr. Shakespeare's knowledge.

"fucking Coach Clark."[6]  (Doc. 68-2 at 8.)  Dr. Shakespeare insists he did not know

about Wilcox and Clark's sexual relationship until after Wilcox's suicide attempt.

According to Wilcox, Dr. Shakespeare subjected her to verbal sexual

harassment, unwanted touching, and stalking from January 2018 through April 2018.

She claims Dr. Shakespeare had made inappropriate comments to her throughout her

high school career, but his comments escalated in the second semester of senior year

after he learned about her sexual relationship with Clark.  Specifically, she says

Dr. Shakespeare repeatedly requested sex from her over this four-month period, told

her he wanted to "fuck" her, and asked if she wanted to have sex on his desk.  He

asked if she wanted him to bend her over his lap and spank her.  On one occasion,

he asked her to show him her breasts.  He also asked to see bikini photos of her on

her phone.  Referencing her relationship with Clark, Dr. Shakespeare told her she

---

[6] The Defendants have moved to strike this portion of Wilcox's declaration under the "sham affidavit" rule.  *See Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."). They argue this portion of her declaration is a "sham" because it omits her deposition testimony that she denied any sexual relationship with Clark.  But omission of the fact that she denied the relationship does not contradict her testimony that she denied it.  Moreover, the omission in her declaration does not contradict her prior testimony about what Dr. Shakespeare allegedly said: namely, that he knew about her relationship with Clark and told her she should not be with a white man when she could be with Dr. Shakespeare.  As discussed above, her denial at best creates a genuine dispute of material fact as to Dr. Shakespeare's knowledge.  Finally, the Defendants do not acknowledge the portion of her declaration where she states Dr. Shakespeare told her that several staff members had told him about her "fucking Coach Clark," let alone argue that it somehow contradicts her prior deposition testimony or is otherwise inadmissible.  Accordingly, to the extent the Defendants move to strike this portion of Wilcox's declaration, the motion is due to be denied.

should not be with a white man and instead should be with Dr. Shakespeare.  He called her out of class to flirt with her.  On at least one occasion, he rubbed her shoulders when she was in his office.  He often told her she had nice skin.  He also stared at her constantly, including one occasion where he also told her not to wear a certain shirt because it was distracting for him.  Dr. Shakespeare also allegedly told Wilcox he had been following her around, had followed her home and gone inside without her knowledge, and had "stalking tendencies."  (Doc. 68-2 at 9.)  Wilcox says she found Dr. Shakespeare's behavior "irritating and annoying," (Doc. 63-1 at 240), and that it "scared" her, (Doc. 68-2 at 10).[7]  Wilcox says she told Jones, Mims, and Clark about Dr. Shakespeare's inappropriate conduct, but no one reported it.

Wilcox struggled emotionally regarding her relationship with Clark and Dr. Shakespeare's sexual harassment.  On or about April 12, 2018, she attempted suicide by overdosing on drugs.  She was hospitalized for several days, and on April 15, 2018, she was admitted to Beacon Children's Hospital for ten days for treatment.

Soon after the overdose, Wilcox's mother, Kimberly Wilcox, and sister discovered Wilcox's sexual relationship with Clark when they found emails between Wilcox and Clark on Wilcox's laptop.  On April 15, 2018, Wilcox's mother reported

---

[7] The Defendants also moved to strike the portion of Wilcox's declaration where she said Dr. Shakespeare's conduct "scared" her on the grounds that it contradicts her deposition testimony that his conduct was "irritating and annoying."  The Court finds this argument without merit. Accordingly, to the extent the Defendants move to strike this portion of her declaration, the motion is due to be denied.

the sexual relationship to the Andalusia Police Department. That same day, the Andalusia Police Department notified Watson, Dr. Shakespeare, and the Board of the allegations of a sexual relationship between Clark and Wilcox. It is undisputed that this April 15, 2018 notice was when Watson first learned about Wilcox's allegations against Clark. Around this time, Wilcox's mother also told Watson she was concerned Wilcox had been made "prey."

On April 16, 2018, the Andalusia Police Department obtained search warrants for both Wilcox's home and AHS. The police also interviewed Wilcox, Clark, Dr. Shakespeare, and others regarding Wilcox's relationship with Clark. When questioned by the police, Clark denied having a sexual relationship with Wilcox. Wilcox initially denied the relationship to protect Clark from prosecution, but she eventually admitted to police that she and Clark had a sexual relationship. Wilcox and Clark both told police about the inappropriate sexual attention Dr. Shakespeare allegedly gave her.

Clark did not return to AHS after April 16, 2018, the day the police first questioned him. Wilcox did not attend school from April 13, 2018 until on or about April 26, 2018, as she was in the hospital. She tried to go back to school on or about April 26,[8] but she left after approximately an hour and a half after breaking down

---

[8] Wilcox testified in her deposition that she returned to school on April 26, 2018, but she asserted in her declaration that she returned to school on April 24, 2018.

crying.  She spoke to Dr. Shakespeare during her time at school that day, but she does not claim that Dr. Shakespeare subjected her to sexual harassment during this time.  She does assert that Dr. Shakespeare told her they needed to "get their stories straight" and how she could get in touch with Clark, although she ultimately did not try to get in touch with him.

Watson's investigation into the allegations against Clark consisted of interviewing Jones and Olivia Ennis, the school guidance counselor.  Watson did not interview Wilcox or any of her friends.  According to Wilcox, no one from AHS or the Board ever contacted Wilcox to ask her about her relationship with Clark. Watson testified that he relied on the Andalusia Police Department's investigation into Wilcox's allegations to determine what actions, if any, the school would take against Clark.  (Doc. 63-3 at 58–59.)  Clark was not placed on leave, so he continued to receive a paycheck while the investigation was ongoing.  In May 2018, the Board terminated Clark's employment by nonrenewing his contract based on abandonment of his job.  Ultimately, neither Clark nor Dr. Shakespeare was charged with any criminal conduct.

In November 2018, Watson received a letter from an attorney for Wilcox's mother setting forth general allegations that Dr. Shakespeare had sexually harassed Wilcox while she was a student.[9]  It is undisputed that this letter was Watson's first

---

[9] The letter was sent to the Board, and Watson received a copy.

actual notice of Wilcox's allegations that Dr. Shakespeare sexually harassed her. Moreover, there is no evidence in the record of any prior allegations that Dr. Shakespeare had sexually harassed a student. In April 2019, Wilcox submitted a detailed complaint setting forth her allegations regarding Dr. Shakespeare's sexual harassment. Watson tasked Hines with interviewing Dr. Shakespeare regarding the allegations. Although Hines spoke to Dr. Shakespeare, she did not consider it an investigation and did not take any notes. Moreover, Hines addressed only Wilcox's allegation that Dr. Shakespeare went by her house and not her allegations of sexual harassment. Ultimately Watson sent Dr. Shakespeare a letter stating that the evidence was inconclusive as to whether Dr. Shakespeare had committed sexual harassment. In the letter, Watson directed Dr. Shakespeare to implement certain procedures going forward, including implementing "ongoing professional development . . . educating Andalusia City School staff members of proper behavior regarding students and the legalities associated with not reporting knowledge of inappropriate behaviors." (Doc. 68-16 at 90.) However, Watson could not recall whether he ever followed up with Dr. Shakespeare to ensure those procedures were implemented.

The relationship with Clark, Dr. Shakespeare's sexual harassment, and the resulting overdose caused Wilcox extreme emotional distress. Except for the brief time on April 26, Wilcox did not go back to school because it was too traumatic for

her.  Thus, she finished her senior year at home and missed one-time senior events, including graduation, although she did graduate in May 2018 and received her diploma.  AHS did not provide her with any counseling services or other resources to help her, even though funding sources were available for such services.

Wilcox has not produced evidence of any prior incidents or allegations of sexual harassment at AHS, whether it be a teacher's sexual relationship with a student, a teacher's sexual harassment of a student, or any other type of inappropriate conduct.

In Count I, Wilcox brings a claim against the Board for hostile educational environment in violation of Title IX.  In Count II, Wilcox brings a claim against the Board for retaliation in violation of Title IX.  In Count III, Wilcox alleges that Watson and Dr. Shakespeare violated her constitutional rights under the Fourteenth Amendment of the United States Constitution in three respects: she brings (1) a § 1983 direct liability claim against Dr. Shakespeare based on his alleged sexual harassment of Wilcox; (2) a § 1983 supervisory liability claim against Dr. Shakespeare based on his alleged deliberate indifference to Clark's sexual misconduct; and (3) a § 1983 supervisory liability claim against Watson based on his alleged deliberate indifference to Clark's and Dr. Shakespeare's sexual misconduct.  In Count IV, Wilcox purports to bring a *Monell*[10] claim against Watson

---

[10] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978).

and Dr. Shakespeare.  In Count V, Wilcox brings an Alabama state law claim of wanton hiring, training, and supervision against Watson and Dr. Shakespeare.  In Count VI, Wilcox brings an Alabama state law outrage claim against Watson and Dr. Shakespeare, and in Count VII, she brings an Alabama state law assault and battery claim against Dr. Shakespeare.  She seeks compensatory and punitive damages, injunctive relief, statutory interest, attorneys' fees, and costs.

## V.  DISCUSSION

The Defendants move for summary judgment on all claims except two: the Title IX claim against the Board in Count I, and the § 1983 direct liability claim against Dr. Shakespeare in Count III based on his alleged sexual harassment of Wilcox.  In addition to arguing that Wilcox cannot establish her remaining claims as a matter of law, Dr. Shakespeare and Watson raise the defense of qualified immunity as to the federal claims and state-agent immunity and federal statutory immunity as to the state law claims.  Dr. Shakespeare raises additional immunity defenses to the state law assault and battery claim against him.  The Court will begin by addressing the federal claims before turning to the state law claims.

### A.  Federal Claims

The Defendants argue summary judgment is due to be granted on the Title IX retaliation claim against the Board in Count II, the § 1983 supervisory liability claims against Watson and Dr. Shakespeare in Count III, and the *Monell* claims

against Watson and Dr. Shakespeare in Count IV.  The Court will address each claim in turn.

### 1. Title IX Retaliation

The United States Supreme Court has recognized a cause of action for retaliation under Title IX.  *Jackson v. Birmingham Bd. of Ed.*, 544 U.S. 167, 173 (2005).  Title IX retaliation claims "are analyzed under the framework for claims under Title VII of the Civil Rights Act of 1964."  *Kocsis v. Fla. State Univ. Bd. of Trs.*, 788 F. App'x 680, 686 (11th Cir. 2019) (per curiam).  Under that framework, the plaintiff must first establish a *prima facie* case of retaliation, which requires the plaintiff to show "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse . . . action; and (3) that there is some causal relation between the two events."  *Id.* (alteration in original) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam)).[11]  Once the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to rebut the

---

[11] The *Kocsis* court explained that while the Eleventh Circuit has not established the standard for a Title IX retaliation claim in a published opinion, it had previously stated in an unpublished opinion that it will "analyze Title IX retaliation claims under Title VII's framework."  788 F. App'x at 686 n.4 (citing *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911 (11th Cir. 2013) (per curiam)).  This Court's research did not reveal a published opinion in which the Eleventh Circuit has established a standard for Title IX retaliation claims.  However, as recently as 2021, the Eleventh Circuit in an unpublished opinion applied Title VII's framework to a Title IX retaliation claim.  *See Whitaker v. Bd. of Regents of Univ. Sys. of Ga.*, No. 20-13618, 2021 WL 4168151, at *3 (11th Cir. Sept. 14, 2021) (per curiam).  Based on this persuasive authority, the Court concludes Wilcox's Title IX retaliation claim is properly analyzed under Title VII's framework.

presumption" of retaliation by proffering a legitimate, nonretaliatory reason for the adverse action. *See Kocsis*, 788 F. App'x at 686–87. If the defendant satisfies this burden, the plaintiff must then show that the defendant's proffered reason was "merely a pretext" for retaliation. *Id.* at 687.

In support of her retaliation claim, Wilcox contends that her mother's reporting of Clark's sexual misconduct to the police and telling Watson she was concerned that Wilcox "had been made prey" constitute protected activity. (Doc. 68 at 92.) Wilcox further argues that after her mother reported Clark's sexual misconduct to the police and expressed her concerns to Watson, the Board retaliated against Wilcox by failing to provide her any counseling or treatment, failing to properly report and investigate the misconduct, and failing to provide the results of any investigation.

Notwithstanding the Eleventh Circuit case law discussed above, the Defendants in their opening brief did not analyze Wilcox's Title IX retaliation claim under Title VII's framework, instead analyzing it like an ordinary Title IX claim. (*See* Doc. 63 at 20–27.) In their reply brief, the Defendants assert for the first time without analysis that Wilcox did not engage in protected activity. And in support of their argument that Wilcox suffered no adverse action—also raised for the first time in their reply brief—the Defendants dispute Wilcox's allegation that she received no support; attempt to justify why the school did not provide her counseling; and argue

that they relied on the police department's investigation, which also meant the police department, and not the Board, was the entity to report the results of its investigation. These arguments may be relevant to whether the Board proffered legitimate, nonretaliatory reasons for its actions, but the Defendants chose to attack Wilcox's *prima facie* case and nothing more—and only in their reply brief.

The Court expresses no view as to whether Wilcox can establish a *prima facie* case of Title IX retaliation. However, the Defendants bear the initial burden in moving for summary judgment, *see Celotex Corp.*, 477 U.S. at 323, and the Court concludes they have failed to demonstrate their entitlement to summary judgment on Wilcox's retaliation claim. Accordingly, the Defendants' motion for summary judgment is due to be denied as to Count II.

### 2. § 1983 Claims Against Watson and Dr. Shakespeare

The Defendants also move for summary judgment on the § 1983 claims asserted against Watson and Dr. Shakespeare in Counts III and IV, arguing among others that Watson and Dr. Shakespeare are entitled to qualified immunity. As relevant to the Defendants' motion, Wilcox alleges in Count III that Watson and Dr. Shakespeare were deliberately indifferent to Clark's sexual misconduct in violation of her Fourteenth Amendment rights. She argues that Dr. Shakespeare knew about Clark's sexual misconduct but failed to report, investigate, or take any action in response to it. She also argues Watson failed to adequately screen Clark

before recommending that the Board hire him; failed to adequately train school employees regarding their mandatory reporting obligations; and failed to adequately investigate Clark's misconduct or discipline Clark. Wilcox further alleges in Count III that Watson was deliberately indifferent to Dr. Shakespeare's sexual harassment in violation of her Fourteenth Amendment rights, arguing that Watson failed to adequately supervise Dr. Shakespeare, investigate his misconduct, or discipline him. The parties agree that these claims against Watson and Dr. Shakespeare rest on a theory of supervisory liability.

In Count IV, Wilcox also purports to bring a *Monell* claim against Watson and Dr. Shakespeare. The substantive allegations underlying Count IV are similar to the substantive allegations underlying Count III, and like Count III, Wilcox seeks to hold Watson and Dr. Shakespeare liable in Count IV under a theory of supervisory liability. The Defendants argue that summary judgment is due to be granted in their favor on Count IV because a *Monell* claim cannot be asserted against an individual school official. Notwithstanding this argument, the Defendants address the substantive allegations underlying Count IV in their discussion of Count III. They argue that even if Count IV is treated as a supervisory liability claim rather than a *Monell* claim, Watson and Dr. Shakespeare are nonetheless entitled to qualified immunity.

Under *Monell*, a *municipality* may be liable under § 1983 for constitutional violations committed by its employees pursuant to a municipal policy or custom. *See* 436 U.S. at 693–95; *Hoefling v. City of Miami*, 811 F.3d 1271, 1279 (11th Cir. 2016). But Wilcox brings her *Monell* claim against Watson and Dr. Shakespeare, whom she has sued in their individual capacities only. She has not sued the City of Andalusia or the Board in Count IV.[12] In response, Wilcox asserts that in the Eleventh Circuit, supervisors may be held liable under § 1983 in certain circumstances. She is correct, but *Monell* liability and § 1983 supervisory liability are not the same thing. Wilcox offers no legal argument as to how a *Monell* claim is proper against Watson and Dr. Shakespeare in their individual capacities under these circumstances. Thus, the Court agrees with the Defendants that Wilcox's *Monell* claim is not cognizable against either Watson or Dr. Shakespeare. *See Chisesi v. Hunady*, No. 19-0221-C, 2021 WL 2099580, at *11 (S.D. Ala. Apr. 19, 2021) (reaching the same conclusion regarding a *Monell* claim brought against a defendant sued only in his individual capacity), *appeal docketed*, No. 21-11700 (11th Cir. May 18, 2021). Accordingly, the Defendants' motion for summary judgment is due to be granted as to Count IV. Nonetheless, the Court will address the substantive allegations underlying Count IV in its discussion of Count III.

---

[12] The Court expresses no view as to whether a *Monell* claim would properly lie against the City, the Board, or both.

Turning to Count III, Wilcox claims that Watson and Dr. Shakespeare violated her Fourteenth Amendment equal protection rights. "The Equal Protection Clause confers a federal constitutional right to be free from sex discrimination," *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1300 (11th Cir. 2007), including the right to be free from sexual harassment at a public school, *see Hill v. Cundiff*, 797 F.3d 948, 978–79 (11th Cir. 2015). Supervisory officials may be liable under § 1983 for constitutional violations committed by their subordinates in two circumstances: (1) "the supervisor personally participates in the alleged constitutional violation," or (2) there is a causal connection between the supervisor's actions and the alleged constitutional violation. *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). Generally, a causal connection may be established in two ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged" constitutional violation, and he fails to do so; or (2) when a supervisor's improper policy or custom results in deliberate indifference to constitutional rights. *Id.*

However, government officials sued in their individual capacities are protected by qualified immunity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Eleventh Circuit has established a two-part analysis to determine whether a defendant is entitled to

qualified immunity.  First, the defendant must show that he was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (quoting *Harlow*, 457 U.S. at 818).  The Eleventh Circuit also sometimes describes step one as requiring a showing that the defendant was "acting within his discretionary authority." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  In determining whether a defendant was engaged in a discretionary function for qualified immunity purposes, courts "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266.   Second, if the court concludes the defendant was engaged in a discretionary function, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. *Id.* at 1264.  To do so, the plaintiff must show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.*

Wilcox argues at length that Watson and Dr. Shakespeare were not performing discretionary functions because they failed to perform mandatory tasks.  According to Wilcox, "[m]andatory functions are not discretionary."  (Doc. 68 at 47.)  Wilcox

lists a number of actions that Watson and Dr. Shakespeare allegedly were required but failed to undertake.  For example, she says they were required by law and AHS policy to report and investigate Clark's sexual misconduct, but they failed to do so.

Wilcox misunderstands the discretionary function inquiry in this context.  It is true that in many other areas, a discretionary function "is defined as an activity requiring the exercise of independent judgment, and is the opposite of a 'ministerial task.'"  *Holloman*, 370 F.3d at 1265.  But "[i]n the qualified immunity context, . . . this 'discretionary function/ministerial task' dichotomy" has been abandoned.  *Id.*  Indeed, the Eleventh Circuit has interpreted "the term 'discretionary authority' to include actions that do not necessarily involve an element of choice." *McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995) (per curiam).  Thus, "for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function." *Holloman*, 370 F.3d at 1265; *see Longmire v. City of Mobile*, No. 16-0025-WS-M, 2016 WL 6403327, at *7 (S.D. Ala. Oct. 26, 2016) (rejecting the plaintiff's argument that the defendant's duties "represented a 'mandatory function' rather than a discretionary function, and that they therefore lie beyond the reach of qualified immunity protection").[13]

---

[13] While the Court acknowledges that *Longmire* is nonbinding, the Court finds its analysis persuasive.

As stated above, courts "look to the general nature of the defendant's action" to determine whether he was engaged in a discretionary function. *Holloman*, 370 F.3d at 1266. Here, "the proper scope of the inquiry is whether investigating and reporting sexual harassment complaints," as well as supervising students and school personnel, "generally fell within [Watson's and Dr. Shakespeare's] duties and authority." *See C.C. ex rel. Andrews v. Monroe Cnty. Bd. of Educ.*, 299 F. App'x 937, 940 (11th Cir. 2008) (per curiam) (reversing denial of qualified immunity to principal where district court had found that principal failed to show he acted within the scope of his discretionary authority).

Wilcox does not dispute that supervising students and school personnel or investigating and reporting sexual harassment complaints generally fell within Watson's and Dr. Shakespeare's duties and authority. Indeed, she insists it was their duty to perform these tasks. And as discussed above, "discretionary authority" includes "actions that do not necessarily involve an element of choice." *McCoy*, 47 F.3d at 407. Viewed through the appropriate lens, Watson and Dr. Shakespeare have demonstrated that they were engaged in discretionary functions when they performed the acts of which Wilcox complains. Thus, the burden now shifts to Wilcox to show that their conduct violated her clearly established constitutional rights. The Court will begin with the claim against Dr. Shakespeare before turning to the claim against Watson.

*a.  Dr. Shakespeare*

Dr. Shakespeare argues he is entitled to qualified immunity because he did not know about Wilcox and Clark's sexual relationship until April 2018, and his subsequent response was not deliberately indifferent.    Wilcox argues Dr. Shakespeare violated her clearly established right to be free from sexual harassment at school because he knew about Wilcox's inappropriate relationship with Clark while it was ongoing but failed to report it or take any action in response. "[A] governmental official . . . may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment."  *Hill*, 797 F.3d at 978 (alterations in original) (citation omitted).   To prevail on a claim of deliberate indifference to sexual harassment, the plaintiff must show that the defendant "'actually knew of and acquiesced in' the discriminatory conduct."  *Id.* (citation omitted).[14]

As to the first prong of the qualified immunity analysis, a genuine dispute of material fact exists as to whether Dr. Shakespeare violated Wilcox's constitutional right to equal protection.  Dr. Shakespeare's argument that he is entitled to qualified immunity is premised upon his version of events—*i.e.*, that he did not know about

---

[14] A federal district court in Alabama has concluded that "the deliberate indifference standard discussed in *Hill* is the same as the supervisory liability standard."  *Weissenbach v. Tuscaloosa Cnty. Sch. Sys.*, No. 7:17-cv-001642-LSC, 2018 WL 5848047, at *11 (N.D. Ala. Nov. 8, 2018). This Court finds this decision persuasive.

Wilcox and Clark's sexual relationship until April 2018.  But based on Wilcox's testimony, a genuine dispute of material fact exists as to whether Dr. Shakespeare actually knew about Clark's inappropriate sexual relationship with Wilcox while it was ongoing.   Wilcox testified Dr. Shakespeare told her he knew about her relationship with Clark, and Dr. Shakespeare also allegedly told her she should not "be" with a white man—present tense—when she could "be" with Dr. Shakespeare—present tense.   Clark is white.   Moreover, Dr. Shakespeare allegedly acknowledged to Wilcox the sexual relationship between her and Clark "several times," and Dr. Shakespeare also allegedly told her that several staff members had told him about her "fucking Coach Clark." (Doc. 68-2 at 8.)  Wilcox's version of events, if believed, would permit a reasonable jury to conclude that Dr. Shakespeare actually knew about Clark's sexual relationship with Wilcox while it was ongoing.

Moreover, viewing the evidence in Wilcox's favor, Dr. Shakespeare did nothing in response to his knowledge of Clark's sexual misconduct.  Dr. Shakespeare did not report it as required by Alabama law and AHS policy.  He did not inform Wilcox's mother.  He did not investigate.  He did not speak to Clark, let alone issue any admonitions or warnings.  He did not implement any monitoring.  A reasonable jury could conclude that "doing nothing was a deliberately indifferent response that

subjected [Wilcox] to further sexual harassment" at Clark's hands.  *See Hill*, 797 F.3d at 979.[15]

Moving to the second prong, viewing the evidence in Wilcox's favor, Dr. Shakespeare violated a clearly established right.   A right may be clearly established for qualified immunity purposes in three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."  *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citation omitted). Although Wilcox does not clearly articulate the method upon which she relies, the second of these methods is applicable here.  "Under this method, 'every objectively reasonable government official facing the circumstances would know that the

---

[15] *Hill* involved a school board and school officials' response to the rape of the plaintiff, a middle school student, by another student. *See* 797 F.3d at 956–66. With respect to the principal's § 1983 liability, the court considered the principal's response to the rape, concluding that "doing nothing was a deliberately indifferent response that subjected [the plaintiff] to further sexual harassment by depriving her of the opportunity to continue attending [the school]." *Id.* at 979.  This Court finds the *Hill* court's statement somewhat puzzling, one reason being that, according to the evidence outlined in the opinion, the plaintiff suffered no additional sexual harassment after the rape.  However, the plaintiff withdrew from school approximately two months after the rape. *Id.* at 965.  To the extent the *Hill* court meant that the principal's deliberate indifference violated the plaintiff's equal protection rights by depriving her of the opportunity to continue attending school, the Court finds Dr. Shakespeare's alleged conduct to be a more obvious constitutional violation because it allowed Clark's sexual misconduct towards Wilcox to continue.

official's conduct did violate federal law when the official acted.'" *Hill*, 797 F.3d at 979 (citation omitted).

Thus, the question here is whether a reasonable official in Dr. Shakespeare's position as principal would know that doing nothing in response to knowledge of an ongoing sexual relationship between a teacher and a high school student was unlawful in light of clearly established law. *Cf. id.* Viewing the evidence and all reasonable inferences in Wilcox's favor, every reasonable official in Dr. Shakespeare's position would know that doing nothing was unlawful "in light of the clearly established principle that deliberate indifference to sexual harassment is an equal protection violation." *See id.*; *see also Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1503 (11th Cir. 1995) (concluding that defendant was not entitled to qualified immunity because a reasonable person in the defendant's position "could not have believed doing nothing in light of [his subordinate's] conduct"—sexual harassment and discrimination against female employees—"was lawful, in light of the clearly established law that sexual harassment and discrimination was an infringement of legal rights"). Thus, Dr. Shakespeare is not entitled to qualified immunity on the § 1983 supervisory liability claim against him in Count III. Accordingly, the Defendants' motion for summary judgment is due to be denied as to this claim.

### b. Watson

As noted above, Wilcox advances several theories of how Watson was deliberately indifferent to her constitutional rights. The Court will begin with her claim that Watson inadequately vetted Clark when Clark was being considered for the basketball coach position. Next, the Court will address her claim that Watson failed to adequately train his employees. Finally, the Court will address her claims that Watson failed to adequately investigate or discipline Clark or Dr. Shakespeare.

### i. Inadequate Screening of Clark

Wilcox argues that, based on his conduct surrounding Clark's hiring, Watson had a custom of deliberate indifference which resulted in the violation of Wilcox's constitutional rights. She argues Watson was deliberately indifferent because he did not adequately screen Clark prior to recommending that Clark be hired and because he allowed the hiring to continue despite being aware of two reports accusing Clark of sexual impropriety with students. She also argues Watson failed to adequately supervise Dr. Shakespeare during the process of hiring Clark because Watson did not require Dr. Shakespeare to adequately screen Clark.

"To impose § 1983 liability based on a hiring decision," a plaintiff must show that the hiring decision reflects deliberate indifference to a known and obvious risk that "a violation of a particular constitutional or statutory right will follow the decision." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1313 (11th Cir. 2001); *see*

28

*also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997) ("Only where adequate scrutiny of an applicant's background would lead a reasonable [official] to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'"). "A showing of simple or heightened negligence will not suffice" to show deliberate indifference. *Bryan Cnty.*, 520 U.S. at 407. The hiring decision here is not deliberately indifferent unless, in light of Clark's record, Clark's engaging in sexual misconduct was "a plainly obvious consequence of the hiring decision." *See id.* at 415.

In support of her argument that the decision to hire Clark was deliberately indifferent, Wilcox relies on *Griffin*, 261 F.3d 1295. In *Griffin*, the Eleventh Circuit upheld a jury verdict holding a city liable for hiring a city manager who later sexually harassed and raped the plaintiff, concluding that the city ignored a known or obvious risk that the applicant was highly likely to engage in sexual harassment if hired. *Id.* at 1313–14. The jury heard evidence that when the city was considering whether to hire the applicant, it was "inundated with articles, faxes, and mail, warning of [the applicant's] problems with sexual harassment." *Id.* at 1314. "[S]ome of the faxes included a list of prior sexual harassment charges against [the applicant]." *Id.* Additionally, "a cursory check" into the applicant's prior employment history would

have further alerted the city to prior sexual harassment complaints against the applicant. *Id.* The applicant's employment file with his previous employer indicated there were complaints of sexual harassment against him, but the city did not obtain his file before hiring him. *Id.* And one of the applicant's former employers testified that if the city had contacted him about the applicant, he would have informed the city about the sexual harassment complaints against the applicant. *Id.*

Even if Watson acted with deliberate indifference with respect to Clark's hiring—an issue about which the Court expresses no view—Watson is nonetheless entitled to qualified immunity because Wilcox has not shown that the unlawfulness of his conduct was clearly established.[16]  In *Griffin*, the liable entity—the city—made the final hiring decision. *See* 261 F.3d at 1314. Here, while Watson was involved in the hiring process, he did not make the final decision to hire Clark, nor did he have the authority to do so. Instead, the Board made the decision to hire Clark based upon Watson's recommendation in accordance with Board policy. Moreover, Watson knew about two reports that Clark had previously engaged in sexual misconduct with students after the Board had voted to hire Clark, whereas in *Griffin*

---

[16] Watson cited only *Griffin* and *Bryan County* in support of her inadequate screening theory, and she does not argue that any other case law provided the requisite notice of the unconstitutionality of Watson's conduct for purposes of overcoming qualified immunity. In *Bryan County*, the Supreme Court merely assumed without deciding that single instance of inadequate screening could expose a municipality to § 1983 liability. 520 U.S. at 412. In its own independent research, the Court could locate no published Eleventh Circuit decision, besides *Griffin*, in which the court found a viable § 1983 inadequate screening claim.

the employer had been "inundated" with reports regarding the applicant's problems with sexual harassment, including a list of prior sexual harassment charges. *See* 261 F.3d at 1314. *Griffin* would not have put every reasonable official on notice that, in light of the two reports of misconduct involving Clark, Clark's engaging in sexual misconduct with a student was a plainly obvious consequence of hiring him. *See Bryan Cnty.*, 520 U.S. at 415. Moreover, unlike *Griffin*, Wilcox has not identified any record evidence from which a reasonable jury could conclude that additional vetting of Clark—either before or after Watson recommended Clark's hiring— would have further alerted Watson to prior sexual harassment complaints against Clark. *Cf. Griffin*, 261 F.3d at 1314. It is undisputed that Watson spoke to the Pleasant Home principal, who said Clark had a "clean record," and unlike *Griffin*, Wilcox has not proffered evidence that an official from UMS-Wright or any of Clark's other prior employers would have informed Watson about additional sexual harassment complaints against Clark.

In sum, *Griffin* did not clearly establish that a school official violates the United States Constitution by recommending, but not ultimately making, the hiring of an individual for employment under the circumstances presented here. While Watson's actions may have fallen short of best practices, Wilcox has failed to show

that his conduct violated clearly established law.[17]   Thus, Watson is entitled to

qualified immunity on the inadequate screening claim.  It follows that Watson is also

entitled to qualified immunity on Wilcox's claim that Watson failed to adequately

supervise Dr. Shakespeare during the hiring process.   Accordingly, summary

judgment is due to be granted as to inadequate screening claim against Watson in

Count III.

### ii.  Inadequate Training

The Court now turns to Wilcox's inadequate training claim.  A supervisor's

liability for a violation of constitutional rights "is at its most tenuous where a claim

turns on a failure to train."  *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1053 (11th Cir.

2014) (quoting *Connick v. Thompson*, 561 U.S. 51, 61 (2011)).  Inadequate training

may "serve as the basis for § 1983 liability only where the failure to train amounts

to deliberate indifference to the rights of persons with whom the [untrained

employees] come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989);

*see also Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir. 1994) ("A

---

[17] The Court expresses no view as to whether the response following Watson's learning of the two
complaints against Clark constitutes deliberate indifference for purposes of the Board's Title IX
liability in Count I.  *Cf. Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1262–63, 1266–67 (11th
Cir. 2010) (holding that material issue of fact existed as to whether school principal and school
board's response to two students' prior sexual harassment complaints against teacher constituted
deliberate indifference for purposes of Title IX claim against school board arising out of teacher's
alleged sexual assault of a third student, but also holding that the two complaints were insufficient
to impose § 1983 supervisory liability on the principal based on his notice of a history of
widespread abuse or his custom or policy of deliberate indifference).

supervisory official is not liable under section 1983 for an injury resulting from his failure to train subordinates unless his 'failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact' and the failure has actually caused the injury of which the plaintiff complains." (citation omitted)). "Only then 'can such a shortcoming be properly thought of as a [supervisor's] "policy or custom" that is actionable under § 1983.'" *Connick*, 561 U.S. at 61 (citation omitted).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a [government] actor disregarded a known or obvious consequence of his action." *Id.* (first alteration in original) (citation omitted).  Thus, to impose liability based on a failure to train, the plaintiff must "demonstrate that the supervisor had 'actual or constructive notice that a particular omission in [his] training program causes [his] employees to violate citizens' constitutional rights,' and that armed with that knowledge the supervisor chose to retain that training program." *Keith*, 749 F.3d at 1052 (quoting *Connick*, 561 U.S. at 61).  To establish that the supervisor had actual or constructive notice of the training deficiency, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary." *Id.* at 1053 (quoting *Connick*, 561 U.S. at 62).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have

deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 561 U.S. at 62.

Additionally, the plaintiff must show that "the deficiency in training actually caused the [untrained employees'] indifference to her [constitutional rights]." *City of Canton*, 489 U.S. at 391 ("Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"). "That a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the [supervisor], for the [employee]'s shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91. For one, "adequately trained [employees] occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [supervisor] liable." *Id.* at 391.

Wilcox argues that Watson failed to adequately train AHS employees regarding their obligations to report all incidents of sexual harassment, and that this failure to train caused the deprivation of her right to be free from sexual harassment at school. According to Wilcox, because four school officials knew about either Clark's sexual misconduct or Dr. Shakespeare's sexual misconduct, and none reported it, Watson must have failed to train his employees regarding their mandatory reporting obligations. (*See* Doc. 68 at 74.) Although her argument is not entirely clear, Wilcox appears to argue that the particular omission in Watson's

training program was that school employees were not informed that they are required to report sexual harassment. She does not contend, for example, that school employees were unaware how to make such reports or to whom the reports should be made.

The Defendants contend that because Alabama law does not recognize a cause of action for inadequate training against supervisory employees, Watson cannot be liable for failure to train under § 1983. The Defendants relatedly insist that the Board, not Watson, had the duty to train employees. Wilcox counters that under Board policy, Watson as superintendent had a duty to train school employees "in identification of potentially violent behaviors and the procedures to be implemented." (*See* Doc. 68-6 at 9.)

The Court will assume without deciding that a failure to train claim could properly lie against Watson under these circumstances. Nonetheless, on this record, Wilcox has not demonstrated that Watson's alleged failure to train his employees amounts to deliberate indifference. Wilcox has identified no evidence of prior constitutional violations caused by untrained employees' failure to report sexual harassment, let alone a pattern of such violations. Nor has she identified other evidence from which a reasonable jury could conclude Watson had "actual or constructive notice that a particular omission in [his] training program"—failing to inform employees about their mandatory reporting obligations—"causes [his]

employees to violate citizens' constitutional rights." *See Keith*, 749 F.3d at 1052 (quoting *Connick*, 561 U.S. at 61). "Without notice that a course of training is deficient in a particular respect, [Watson] can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *See Connick*, 561 U.S. at 62.

Even if she had shown Watson had the requisite notice, she has not demonstrated that "the deficiency in training actually caused" the untrained school officials' indifference to her rights. *See City of Canton*, 489 U.S. at 391. As the Supreme Court has explained, an employee's "shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91. Here, AHS policy required all school officials to report sexual harassment, and Alabama law requires school officials to report any suspected child abuse. On this record, Wilcox has not shown that the deficiency in training—failing to tell school officials about their mandatory reporting obligations—caused the officials' indifference to her rights. Accordingly, summary judgment is due to be granted as to the inadequate training claim against Watson in Count III.

### iii. Inadequate Investigation and Discipline

Wilcox also argues that Watson is liable under § 1983 for his failure to adequately investigate or discipline Clark or Dr. Shakespeare. Board policy provides that the "Superintendent or designee has the responsibility of investigating

and resolving complaints of sexual harassment." (Doc. 68-6 at 15.) Wilcox identifies multiple ways in which the investigations of Clark and Shakespeare were allegedly inadequate. For example, she contends that Watson conducted no investigation of her allegations against Clark and instead abdicated his responsibility in favor of the Andalusia Police Department's investigation. Moreover, she faults Watson for nonrenewing Clark's contract on the grounds of job abandonment and also for allowing Clark to continue to receive a paycheck in the meantime even though Clark did not return to school after April 16, 2018. Wilcox also asserts that the investigation of Dr. Shakespeare was inadequate because although Hines spoke to Dr. Shakespeare, she did not consider it an investigation and did not take any notes. Moreover, Hines addressed only Wilcox's allegation that Dr. Shakespeare went by her house and not her allegations of sexual harassment. Wilcox also complains that the only "discipline" Dr. Shakespeare received related to her allegations was a letter from Watson directing Dr. Shakespeare to implement certain procedures going forward.

The Court will assume without deciding that Watson's investigation and discipline of Clark was inadequate. Nonetheless, Wilcox's claim fails because she cannot show that the inadequate investigation or discipline caused her constitutional rights to be violated. The parties agree that as a high school student, Wilcox had a constitutional right to be free from sexual harassment. But it is undisputed that after

Watson learned about Wilcox's allegations against Clark, Wilcox did not suffer additional sexual harassment at Clark's hands. Indeed, Wilcox and Clark were never at school at the same time after Watson learned about the allegations.

The Court acknowledges that *Hill* suggested a supervisory official who did nothing in response to known sexual harassment of a student could be liable under § 1983 by depriving the student of the ability to continue attending school. *See Hill*, 797 F.3d at 979. To the extent Wilcox advances this theory, her argument is confined to two sentences and contains no citation to authority. (*See* Doc. 68 at 76.) At summary judgment, "the onus is upon the parties to formulate arguments," and "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc). Given Wilcox's minimal discussion, the Court declines to address this theory further—except to observe it is at best uncertain that Watson's conduct with respect to the investigation and discipline of Clark violated clearly established law, particularly given the undisputed facts that Watson conducted *some* investigation into Clark's alleged misconduct. Accordingly, Watson is entitled to qualified immunity with respect to the claim that he inadequately investigated and disciplined Clark.

As to Wilcox's argument that Watson's failure to adequately investigate or discipline Dr. Shakespeare constitutes deliberate indifference to her constitutional

rights, this argument also fails. It is undisputed that Watson first learned about Wilcox's general allegations against Dr. Shakespeare in November 2018, at which point Wilcox was no longer a student at AHS. Similarly, the investigation of Dr. Shakespeare and any discipline imposed occurred after Wilcox was no longer a student. It therefore follows that Watson's alleged deliberate indifference did not cause Wilcox to suffer further sexual harassment by Dr. Shakespeare, nor did it deprive her of an education at AHS. Thus, Wilcox cannot show that Watson's allegedly inadequate investigation or discipline of Dr. Shakespeare caused her constitutional rights to be violated. Consequently, Watson is entitled to qualified immunity on this claim as well.

Accordingly, summary judgment is due to be granted on the claims against Watson in Count III.[18]

### B. State Law Claims

Dr. Shakespeare moves for summary judgment on the assault and battery claim against him, and Watson and Dr. Shakespeare both move for summary judgment on the outrage and the wanton hiring, training, and supervision claims against them. For ease of reference, the Court may hereinafter refer to the last claim

---

[18] To the extent Wilcox argues Watson implemented inadequate training in response to her allegations about Clark's and Dr. Shakespeare's misconduct, this argument is unavailing for the same reasons as her inadequate investigation argument. After Watson learned about Wilcox's allegations, Wilcox suffered no further sexual harassment. Thus, assuming without deciding that the subsequent training implemented by Watson was inadequate, Wilcox cannot show that the allegedly inadequate training caused her constitutional rights to be violated.

as Wilcox's wanton training claim. They also invoke the defense of state-agent immunity and federal statutory immunity, and Dr. Shakespeare invokes additional immunity defenses as to the assault and battery claim.

The Court will first address the wanton training claims against both officials, followed by the assault and battery claim against Dr. Shakespeare, and finally the outrage claim against both officials.

### 1. Wanton Hiring, Training, and Supervision

Watson and Dr. Shakespeare contend they are entitled to summary judgment on the wanton training claim. They argue that "Alabama law does not recognize a claim against a supervisory employee for negligent supervision or training of subordinates," (Doc. 63 at 39), citing Alabama federal district court decisions reaching this conclusion.

In Alabama, an employer (a "master") is liable for the "incompetency" of its employee (a "servant") when it is "established by affirmative proof that [the servant's] incompetency was actually known by the master or that, had [the master] exercised due and proper diligence, [the master] would have learned that which would charge [the master] in the law with such knowledge." *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993) (citation omitted), *superseded by statute on other grounds as stated in Horton Homes, Inc. v. Brooks*, 832 So. 2d 44, 57 (Ala. 2001). Watson and Dr. Shakespeare's cited decisions and others have

concluded that Alabama law does not recognize a cause of action for a supervisory employee's negligent or wanton training, supervision, or retention of a subordinate. *See, e.g.*, *Johnson v. Yarbrough*, No. 6:17-cv-00557-LSC, 2019 WL 5963529, at *9 (N.D. Ala. Nov. 13, 2019) ("Alabama law does not recognize a cause of action against a supervisory employee for negligent training or supervision."); *Hammond v. City of Eufaula*, No. 2:11-CV-1045-WKW, 2012 WL 4343871, at *3 (M.D. Ala. Sept. 20, 2012) (dismissing claims for negligent *and* wanton supervision and retention); *Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1314–15 (S.D. Ala. 2001). This is because "one element of the tort of negligent supervision or training of an [employee] is the existence of a master-servant relationship between the [employee] and his supervisor." *Crutcher v. Vickers*, No. CV-10-S-01176-NE, 2012 WL 3860557, at *13 (N.D. Ala. Sept. 5, 2012). "However, a supervisor 'is not the master of a subordinate, nor is the subordinate the servant of the supervisor; rather, as Alabama cases make plain, the status of "master" is restricted to one who is actually or essentially the employer of the servant.'" *Id.* (citation omitted).[19]

---

[19] Although many district court opinions on this issue address only negligent training claims, their reasoning applies with equal force to wanton training claims because wanton training claims also require the existence of a master-servant relationship. Wanton training and negligent training claims differ in that the former requires a showing that the employer wantonly or recklessly disregarded its employee's misconduct, *see Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 679, 682 (Ala. 2001), whereas the latter requires a showing that the employer failed to exercise "due care in the way that they handled the matter," *see Big B*, 634 So. at 1004.

Wilcox has not responded to the Defendants' argument or cited any authority reaching the opposite conclusion. In light of the persuasive authority from Alabama federal district courts along with Wilcox's failure to respond (let alone persuasively) to the Defendants' argument or authority, the Court concludes that Alabama does not recognize a cause of action against supervisory employees for negligent or wanton hiring, training, and supervision. Consequently, summary judgment is due to be granted as to the claim against Watson and Dr. Shakespeare in Count V.

### 2. Assault and Battery Claim

Dr. Shakespeare also argues he is entitled to summary judgment on Wilcox's assault and battery claim. While he admits that he intentionally touched Wilcox, he contends that the touching was not conducted in a harmful or offensive manner. He also argues that he is entitled to state-agent immunity, parental immunity, so-called statutory immunity, and federal statutory immunity.

To establish an assault and battery claim under Alabama law,[20] the plaintiff must show "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful

---

[20] While assault and battery are separate torts, a successful assault "becomes a battery." *See Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986). Thus, in cases like this one where the plaintiff alleges physical contact, courts sometimes treat assault and battery as a single claim. *See Harper v. Winston Cnty.*, 892 So. 2d 346, 354 (Ala. 2004) (discussing the plaintiff's "assault-and-battery claim"); *see also Simmons v. Frank Norton, LLC*, No. 2:15-cv-00147-SGC, 2017 WL 3191094, at *8 (N.D. Ala. July 27, 2017) ("Assault and battery are frequently analyzed together because they involve overlapping elements and facts . . . ."). The Court does so here.

or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998).  Intentional touchings that were "conducted with sexual overtones" and were "unwelcome" constitute sufficient evidence of battery. *Id.* at 1194.

Here, Wilcox testified that Dr. Shakespeare rubbed her shoulders on one occasion while she was sitting in his office.  Dr. Shakespeare does not dispute that he intentionally touched Wilcox.  Although he claims he rubbed Wilcox's shoulders to try to comfort her when she was upset, Wilcox testified that Dr. Shakespeare's conduct was "irritating and annoying" and "scared" her.  Wilcox's testimony, if believed, would allow a reasonable jury to conclude that the touching was unwelcome.  Moreover, given the nature and volume of sexual comments Dr. Shakespeare allegedly made to Wilcox on other occasions, a reasonable jury could conclude that the shoulder rubbing was conducted with sexual overtones.

A jury may ultimately agree with Dr. Shakespeare and find that the touching was not conducted in a harmful and offensive matter.  But viewing the evidence and all reasonable inferences in Wilcox's favor, as the Court must at this stage, a reasonable jury may reach the opposite conclusion.  In sum, Wilcox has offered sufficient evidence from which a reasonable jury could conclude that Dr. Shakespeare committed a battery.

Dr. Shakespeare also raises four immunity defenses to Wilcox's assault and battery claim: (1) state-agent immunity; (2) parental immunity; (3) "statutory

immunity" under ALA. CODE § 13A-3-24; and (4) federal statutory immunity under

20 U.S.C. § 7941.  The Court will address each defense in turn.

*a.  State-Agent Immunity*

In *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000), the Alabama Supreme

Court established a two-step burden-shifting framework for analyzing claims of

state-agent immunity.   Under this framework, Dr. Shakespeare bears the initial

burden of demonstrating that his conduct falls into one of the following categories:

(1) formulating plans, policies, or designs; or

(2) exercising his or her judgment in the administration of a department
or agency of government, including, but not limited to, examples such
as:

(a) making administrative adjudications;
(b) allocating resources;
(c) negotiating contracts;
(d) hiring, firing, transferring, assigning, or supervising
personnel; or

(3) discharging duties imposed on a department or agency by statute,
rule, or regulation, insofar as the statute, rule, or regulation prescribes
the manner for performing the duties and the State agent performs the
duties in that manner; or

(4) exercising judgment in the enforcement of the criminal laws of the
State, including, but not limited to, law-enforcement officers' arresting
or attempting to arrest persons; or

(5) exercising judgment in the discharge of duties imposed by statute,
rule, or regulation in releasing prisoners, counseling or releasing
persons of unsound mind, or educating students.

*Id.*; *accord Hill*, 797 F.3d at 980.  If he makes such a showing, the burden then shifts to Wilcox to show that one of two exceptions to state-agent immunity applies: (1) "the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require[d] otherwise"; or (2) Dr. Shakespeare "act[ed] willfully, maliciously, fraudulently, in bad faith, beyond his . . . authority, or under a mistaken interpretation of the law." *Cranman*, 792 So. 2d at 405.

Here, Dr. Shakespeare contends that his conduct—rubbing Wilcox's shoulders to try to comfort her—was part of his exercise of judgment in educating students, and that "[e]ducating students includes not only classroom teaching, but also supervising and educating students in all aspects of the educational process," *Ex parte Trottman*, 965 So. 2d 780, 783 (Ala. 2007).  Although Dr. Shakespeare contends his touching was intended to comfort Wilcox, Wilcox alleges—and a reasonable jury could conclude—that Dr. Shakespeare intentionally touched her and that the touching was unwelcome and conducted with sexual overtones, as discussed above.  Viewing the facts in this light, Dr. Shakespeare's touching of Wilcox was not part of his exercise of judgment in educating students or part of the educational process.  Thus, the Court is not persuaded that Dr. Shakespeare has satisfied his

initial burden under *Cranman* that state-agent immunity applies to his alleged conduct.

Even if Dr. Shakespeare had satisfied his initial burden, the Court agrees with Wilcox that his alleged conduct is nonetheless not covered by state-agent immunity because it was plainly beyond his authority.  *K.M. v. Ala. Dep't of Youth Servs.*, 360 F. Supp. 2d 1253, 1264 (M.D. Ala. 2005) (concluding that conduct of state official who allegedly molested a juvenile detainee was beyond his authority and "therefore not covered by state-agent immunity"); *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1309 (M.D. Ala. 2010) (concluding that conduct of state officials, including unwanted touching, violated "policies by which they were bound and thus exceeded their authority").  Accordingly, Dr. Shakespeare is not entitled to state-agent immunity.

### b.  *Parental Immunity and Statutory Immunity*

The Court now turns to Dr. Shakespeare's invocation of parental immunity and so-called statutory immunity.  Relying on *Suits v. Glover*, 71 So. 2d 49 (1954), Dr. Shakespeare argues that he is entitled to parental immunity because "[a] schoolmaster is regarded as standing in *loco parentis* and has the authority to administer moderate correction to pupils under his care."  *Id.* at 50.  Under *Suits*, "a teacher may punish a student unless he 'inflict[s] on the child immoderate chastisement . . . with legal malice or wicked motives . . . or inflict[s] some

permanent injury.'" *Deal ex rel. Barber v. Hill*, 619 So. 2d 1347, 1349 (Ala. 1993) (alterations in original) (quoting *Suits*, 71 So. 2d at 50).    According to Dr. Shakespeare, because Wilcox has not produced evidence that he acted with malice or wicked motives or that he inflicted any permanent injury, he is entitled to parental immunity.

Parental immunity as set forth in *Suits* is inapplicable here.  Both *Suits* and *Deal* involved assault and battery claims arising out of a teacher's allegedly excessive corporal punishment of a student at school.  Wilcox's claim is not that Dr. Shakespeare used corporal punishment, excessive or otherwise.  Instead, her claim is that Dr. Shakespeare subjected her to unwelcome touching conducted with sexual overtones.  Another judge in this district declined to apply *Suits* to a student's claim of assault and battery arising out of a classroom strip search, concluding that "the *Suits* standard is applicable to corporal punishment of a student" and was "therefore distinguishable" from the case before it.  *See H.Y. ex rel. K.Y. v. Russell Cnty. Bd. of Educ.*, 490 F. Supp. 2d 1174, 1192–93 (M.D. Ala. 2007).  This Court finds the analysis in *H.Y.* persuasive and concludes that *Suits* similarly does not apply to Wilcox's assault and battery claim predicated upon unwelcome touching conducted with sexual overtones.

Dr. Shakespeare also argues that he is entitled to so-called statutory immunity under ALA. CODE § 13A-3-24.  Section 13A-3-24 provides that "a teacher or other

person responsible for the care and supervision of a minor for a special purpose"
may "use reasonable and appropriate physical force to maintain discipline or
promote the welfare of a minor." But § 13A-3-24, which is part of the Alabama
Criminal Code at Title 13A, provides for defenses to criminal—not civil—liability.
Indeed, § 13A-3-21(c) states that any defense "within the meaning of this article
does not abolish or impair any civil remedy or right of action which is otherwise
available." Thus, to the extent Dr. Shakespeare argues that § 13A-3-24 immunizes
him from Wilcox's civil assault and battery claim, this argument is without merit.
Dr. Shakespeare's argument also fails for similar reasons as set forth above
regarding parental immunity. Wilcox does not claim or argue that Dr. Shakespeare
used unreasonable or inappropriate "force" when he touched her. And under her
theory of her claim, Dr. Shakespeare's touching was not done to "maintain
discipline" or promote her welfare. For this additional, independent reason,
Dr. Shakespeare is not entitled to "immunity" under ALA. CODE § 13A-3-24.

### c.  Federal Statutory Immunity

Dr. Shakespeare additionally argues he is entitled to federal statutory
immunity under a specific provision of the No Child Left Behind Act, known as the
Paul D. Coverdell Teacher Protection Act of 2001, 20 U.S.C. § 7941 *et seq.* (the

Act).[21]   Section 7946(a) provides in relevant part that no school teacher shall be

liable for harm caused by the teacher's act or omission on behalf of the school if five

conditions are satisfied:

> (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;

> (2) the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) *in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school*;

> (3) if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;

> (4) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher; and

> (5) the harm was not caused by the teacher operating a motor vehicle, vessel, aircraft, or other vehicle for which the State requires the operator or the owner of the vehicle, craft, or vessel to—

> > (A) possess an operator's license; or

> > (B) maintain insurance.

20 U.S.C. § 7946(a) (emphasis added).   Dr. Shakespeare cites no Supreme Court or

Eleventh Circuit case law interpreting the Act, and the Court's independent research

---

[21] The Defendants cited to 20 U.S.C. § 6731, but as Wilcox correctly points out, the code provision was recodified to § 7941.

revealed none.[22]   Nonetheless, the Court has little trouble concluding at this stage that the Act does not shield Dr. Shakespeare from liability.   Viewing the evidence and all reasonable inferences in Wilcox's favor, Dr. Shakespeare does not satisfy the Act's second prerequisite because his alleged actions, if true, were not carried out "in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school."   *See id.*   Under her theory of her claim, Dr. Shakespeare's touching was not carried out in furtherance of any of these efforts.   Consequently, Dr. Shakespeare is not entitled to immunity under the Act.

In sum, Wilcox has presented sufficient evidence from which a reasonable jury could conclude that Dr. Shakespeare committed the tort of assault and battery, and Dr. Shakespeare is not entitled to state-agent immunity, parental immunity, "statutory immunity" under ALA. CODE § 13A-3-24, or federal statutory immunity under 20 U.S.C. § 7946.   Accordingly, summary judgment is due to be denied as to the assault and battery claim against Dr. Shakespeare.

---

[22] The Court located one decision from an Alabama federal district court in which the court concluded that that Act did not apply to shield a teacher from liability on a student's state law negligence/wantonness claim because the teacher's conduct was "reckless" and a "flagrant indifference" to the safety of the student.   *See Hill v. Madison Cnty. Sch. Bd.*, 957 F. Supp. 3d 1320, 1347 n.27 (N.D. Ala. 2013), *aff'd in part, rev'd in part sub nom. Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015).

### 2. Outrage

Watson and Dr. Shakespeare argue that Wilcox's outrage claim fails because the conduct about which she complains is insufficiently outrageous. To recover under the tort of outrage, the plaintiff must demonstrate that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 676 (Ala. 2017).

"The tort of outrage is an extremely limited cause of action." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). The paradigm factual circumstances in which the Alabama Supreme Court has recognized it are: "(1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Wilson*, 266 So. 3d at 677 (citations omitted). While the tort of outrage is not strictly limited to those three categories of conduct, *id.*, the challenged conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society," *Jenkins v. U.S. Fid. & Guar. Co.*, 698 So. 2d 765, 768 (Ala. 1997) (citation omitted).

The Court will first address the outrage claim against Dr. Shakespeare, and then the claim against Watson.

*a. Dr. Shakespeare*

Wilcox's evidence, if believed, is sufficient for a reasonable jury to find that Dr. Shakespeare's conduct was extreme and outrageous.  According to Wilcox, Dr. Shakespeare repeatedly requested sex from her—a minor high-school student—over a four-month period.  He told her he wanted to "fuck" her.  On one occasion, he asked if she wanted to have sex on his desk.  He asked her to show him her breasts and to show him bikini photos of her on her phone.  He asked if she wanted him to bend her over his lap and spank her.  Referencing her relationship with Clark, Dr. Shakespeare told her she should not be with a white man and instead should be with Dr. Shakespeare.  He often told her she had nice skin.  He stared at her constantly, including an occasion where he also told her not to wear a certain shirt because it was distracting for him.

Standing alone, Dr. Shakespeare's comments might not allow Wilcox to survive summary judgment on her outrage claim.  But in addition to the inappropriate and sexually charged comments he allegedly made to Wilcox, Dr. Shakespeare also allegedly told Wilcox he had been following her around, had followed her home and gone inside without her knowledge, and had "stalking tendencies."  Dr. Shakespeare also violated Alabama law and school policy when he failed to report Clark's sexual misconduct after learning about it.  Moreover, when all of these alleged acts and omissions occurred, Wilcox was a minor, and

Dr. Shakespeare was in a position of authority as the principal of Andalusia High School—indeed, (one of) the school's highest positions of authority.  A reasonable jury could conclude Dr. Shakespeare not only sexually harassed, touched, and stalked Wilcox, but he also "did so by abusing his position of authority."  *See K.M.*, 360 F. Supp. 2d at 1261 (concluding that if official did sexually assault minor detainee as alleged, the official "did so by abusing his position of authority," which was one of several factors supporting recovery for tort of outrage).

Many cases finding egregious sexual harassment involve touching of private parts.  *See, e.g.*, *Mills v. Wex-Tex Indus.*, 991 F. Supp. 1370, 1386 (M.D. Ala. 1997) (denying summary judgment on the female plaintiff's outrage claim where the defendant supervisor had, among others, grabbed her buttocks, grabbed her breasts twice, pinned her against a wall and tried to kiss her, and pinched her).  Although Wilcox does not allege physical contact of this nature, the Court finds this is not fatal to her outrage claim under the unique circumstances of this case.  Considered together, a reasonable jury could find that Dr. Shakespeare's alleged conduct—the nature and volume of his inappropriate and sexually charged comments directed towards Wilcox, the unwanted touching, the instance of stalking Wilcox, his failure to report Clark's sexual misconduct, Wilcox's status as a minor, and Dr. Shakespeare's position of authority—was extreme and outrageous. *See Wilborn*, 720 F. Supp. 2d at 1297, 1312 (denying summary judgment on vocational student

plaintiff's outrage claim where the defendant instructors allegedly "constantly" told inappropriate jokes pertaining to women and women's body parts, made other inappropriate sexual remarks to the plaintiff, showed the plaintiff a pornographic video, subjected her to unwanted touching, and engaged in other inappropriate conduct); *K.M.*, 360 F. Supp. 2d at 1261.  Because the other elements of the tort of outrage are not in dispute at this stage, a reasonable jury could thus conclude that Dr. Shakespeare committed the tort of outrage.

Dr. Shakespeare argues summary judgment is nonetheless due to be granted on the outrage claim because he is entitled to state-agent immunity or, in the alternative, federal statutory immunity.  Similar to his argument regarding the assault and battery claim, Dr. Shakespeare contends that state-agent immunity applies to the outrage claim because he was engaged in the educational process when he touched Wilcox's shoulder in an attempt to comfort her.   Even if Dr. Shakespeare were correct about the shoulder touching—which he is not, for the reasons explained above—Dr. Shakespeare is nonetheless not entitled to state-agent immunity on the outrage claim because he altogether fails to address Wilcox's testimony that he verbally sexually harassed her, let alone explain why he would be entitled to state-agent immunity for this alleged conduct.  Dr. Shakespeare does not argue, let alone persuasively so, that his alleged conduct—including asking Wilcox for sex and asking her to show him her breasts—was part of the educational process or evinces

his exercise of judgment in educating students.  Thus, Dr. Shakespeare has failed to satisfy his initial burden under *Cranman* of showing that his alleged conduct is covered by state-agent immunity.

Dr. Shakespeare is also not entitled to federal statutory immunity on the outrage claim.  Viewing the evidence and all reasonable inferences in Wilcox's favor, Dr. Shakespeare does not satisfy the Act's second prerequisite because his alleged actions were not carried out "in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school." *See* 20 U.S.C. § 7946(a).  This Court cannot conceive of a circumstance in which verbal sexual harassment of a student could be carried out in furtherance of any of these efforts.  For these reasons, Dr. Shakespeare is not entitled to immunity under § 7946(a).

Accordingly, summary judgment is due to be denied as to the outrage claim against Dr. Shakespeare in Count VI.

### b. Watson

The Court now turns to Wilcox's outrage claim against Watson.  Her claim against Watson is not predicated upon egregious sexual harassment but rather Watson's alleged acts and omissions surrounding Clark's hiring and Clark's subsequent misconduct towards Wilcox.  According to Wilcox, she has a viable outrage claim against Watson based on the following: Watson failed to properly vet

Clark or check his references, Watson was warned before Clark's start date of Clark's alleged sexual misconduct at other schools, Watson did not report Clark's sexual misconduct towards Wilcox, and Watson took no action in response to the sexual misconduct that was known in the school and community.

Watson's alleged conduct does not fall into one of the three categories of viable outrage claims, and she has cited no case law in which a court has found that a party committed the tort of outrage based on conduct comparable to Watson's. Wilcox's claim that Watson failed to properly vet Clark "does not rise to the level of outrage required under Alabama law." *Cf. Weissenbach v. Tuscaloosa Cnty. Sch. Sys.*, No. 7:17-cv-001642-LSC, 2018 WL 5848047, at *1, *6 (N.D. Ala. Nov. 8, 2018) (concluding that the plaintiff, a former high school student, failed to plead a plausible outrage claim against vice principals and school board members based on their allegedly inadequate investigation into a complaint that the plaintiff was having a sexual relationship with her high school teacher). Although Watson perhaps could have more thoroughly vetted Clark, especially after Watson received reports of Clark's alleged sexual misconduct at other schools, the record reflects that Watson took some steps to investigate the allegations after he learned about them. *Cf. id.* at *6 ("Although perhaps the school officials could have launched a more thorough investigation into the [complaint], the facts alleged do suggest that they did take some steps to investigate [the teacher].").  Thus, while Watson's investigation may

have been deficient, it falls short of conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *See Jenkins*, 698 So. 2d at 768.

As to the claim that Watson did not report or respond to Clark's sexual misconduct, Wilcox identifies no record evidence that Watson knew about Clark's misconduct prior to April 15, 2018, when the Andalusia Police Department notified Watson about Wilcox's allegations of a sexual relationship with Clark.  Watson testified that he relied on the Andalusia Police Department's investigation into Wilcox's allegations to determine what actions, if any, the school would take against Clark.  (Doc. 63-3 at 59.)  It is undisputed that Wilcox did not attend school from April 13, 2018 until approximately April 26, 2018, and that Clark did not return to AHS after April 16, 2018—meaning Wilcox and Clark were not at the school at the same time after Watson learned about the alleged misconduct.  In May 2018, the Board terminated Clark's employment by nonrenewing his contract based on abandonment of his job.  Bearing in mind the Alabama Supreme Court's admonition that "[t]he tort of outrage is an extremely limited cause of action," *Potts*, 771 So. 2d at 465, Watson's alleged acts and omissions are insufficiently outrageous to meet the high bar for the tort of outrage under Alabama law.  *See Jenkins*, 698 So. 2d at

768; *cf. Weissenbach*, 2018 WL 5848047, at *6.  Accordingly, summary judgment is due to be granted as to the outrage claim against Watson in Count VI.[23]

## C.  Relief Sought

The Defendants also argue that Wilcox cannot be awarded punitive damages against the Board, that she cannot be awarded attorneys' fees as to the state law claims, and that her request for injunctive relief is moot because she is no longer a student.  Wilcox concedes these points in her response, (Doc. 68 at 46 n.13.), and the Court thus finds that these requests for relief are due to be stricken.  The Defendants also argue that Wilcox's request for statutory interest "is not valid, at least pre-judgment." (Doc. 63 at 63.)  Although Wilcox did not respond to this point, the Court need not decide at this stage whether the request for statutory interest is valid since no judgment has been entered.

## D.  Motions to Strike

Finally, the Court addresses the Defendants' motions to strike portions of the declarations of Wilcox and Wilcox's mother.  As previously stated, the motion to strike portions of Wilcox's declarations is due to be denied on the merits to the extent it seeks to strike her statement about Dr. Shakespeare's knowledge of Wilcox's relationship with Clark and her statement that Dr. Shakespeare's conduct scared her.

---

[23] Because Wilcox's claim fails on the merits, the Court pretermits discussion of Watson's immunity defenses.

Otherwise, both motions are due to be denied as moot.  Except for the challenged portions of Wilcox's declaration that the Court has already discussed, the Court did not rely upon any portion of either declaration in reaching its decision, nor would the declarations, if relied upon, change the Court's conclusion.

## VI.  CONCLUSION

For the foregoing reasons, it is

ORDERED as follows:

1.     The Defendants' Motion for Partial Summary Judgment (Doc. 62) is GRANTED to the extent that the claims against Ted Watson and Dr. Daniel Shakespeare in Counts IV and V and the claims against Watson in Counts III and VI are DISMISSED; and Wilcox's requests for injunctive relief, punitive damages against the Board, and attorneys' fees as to the state law claims in the Complaint's prayer for relief are STRICKEN.  The Motion is DENIED in all other respects.

2.     The Defendants' Motion to Strike Portions of Declaration of Plaintiff (Doc. 73) is DENIED as moot in part and DENIED on the merits in part as set forth herein.

3.     The Defendants' Motion to Strike Portions of Declaration of Kimberly Wilcox (Doc. 74) is DENIED as moot.

4.     Ted Watson is DISMISSED as a party to this case, and the Clerk of Court is DIRECTED to terminate him as a defendant.

5.      The following claims will proceed: Counts I and II against the Board;

and Counts III, VI, and VII against Dr. Daniel Shakespeare.

DONE, on this the 8th day of March, 2023.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE